**STAR LINES, LTD., Plaintiff,**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY and Pacific Far East Lines, Defendants.**

**No. 77 Civ. 1968.**

United States District Court, S. D. New York.

Jan. 5, 1978.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for plaintiff; John E. Sprizzo, Eliot Lauer, Warren Harrison, New York City, of counsel.

Austrian, Lance & Stewart, P. C., New York City, for Puerto Rico Maritime Shipping Authority; William Klein, II, Sandra Gale Behrle, New York City, Galland, Kharasch, Calkins & Short, Washington, D. C., of counsel.

Alioto & Alioto, San Francisco, Cal., for Pacific Far East Lines; Judith A. Genovese, San Francisco, Cal., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This action, involving claimed violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) as well as two common law claims for relief, grows out of the termination by defendant Puerto Rico Maritime Shipping Authority ("PRMSA") of an agency agreement between it and plaintiff. Defendant PRMSA has moved for transfer to the District of Puerto Rico on the grounds that venue is lacking over it in this district (28 U.S.C. § 1406(a)), or alternatively, that the convenience of parties and witnesses, and the interest of justice, so require (28 U.S.C. § 1404(a)).[1] The motion is denied.[2]

PRMSA is both a public agency and a non-stock, profit-making corporation created, owned and controlled by the Commonwealth of Puerto Rico. Its purpose and powers are "to own and regulate all aspects of commercial freight shipping in and out of the island from the Eastern and Gulf ports of the mainland as a public service." Affidavit of Roberto Lugo D'Acosta, Executive Director of PRMSA, I.A. In order to carry out its shipping business, PRMSA acquired control over privately owned marine transportation facilities in Puerto Rico and some twelve cargo ships.

PRMSA's only office, and all its employees, are in San Juan. It has chosen, apparently, to limit its involvement in the running of the business to control over "policy decisions"—i. e., long-term management decisions. D'Acosta Aff., I.C.4. All of the actual day-to-day management and operation of the shipping business has been contracted out to an "independent mainland-based agent[ ]" (D'Acosta Aff., I.C.4), Puerto Rico Marine Management Inc.

("PRMMI").[3] PRMMI is a New Jersey corporation, with its principal offices in Elizabeth, New Jersey, and with other offices in many other cities, including New York.

One of the twelve ships in PRMSA's fleet is the S. S. Puerto Rico, a modern "roll-on roll-off" vessel in which the cargo is carried on trailers which are driven on and off the ship. The S. S. Puerto Rico was used exclusively to transport cargo between ports on the East Coast of the United States and the Persian Gulf. In May 1976, PRMSA entered into an agency contract regarding the S. S. Puerto Rico with plaintiff, a Liberian corporation. Under the terms of the contract, Star Lines was to be the agent of PRMSA for purposes of servicing and booking cargo for the S. S. Puerto Rico on its East Coast-Persian Gulf runs.

Early in 1977, the agency agreement broke down. On January 4, Star Lines apparently tried to assign its right under the agreement to Pacific Far East Lines ("PFEL"),[4] co-defendant in this action, subject to the approval of PRMSA; but PRMSA did not approve. Instead, on February 15, it gave notice of termination of the agreement to Star Lines and, two days later, gave Star Lines a first refusal offer to subcharter the S. S. Puerto Rico. The next day, Star Lines rejected the subcharter offer on the proffered terms, and also expressed its disagreement with PRMSA as to what date the termination would become effective. At about this time,[5] PRMSA chartered the S. S. Puerto Rico to PFEL, purportedly on the same terms it offered to Star Lines on February 17. Two months later, the instant suit was commenced.

The first two "counts" of Star Lines' complaint sound in antitrust law. They

---

1. PRMSA's motion for a stay of arbitration proceedings presently pending between it and plaintiff, made simultaneously with the motion for transfer, has since been withdrawn.

2. Defendant Pacific Far East Lines has moved for an extension of time in which to answer the complaint, until such time as defendant PRMSA is required to answer. No papers in opposition have been submitted. This motion is granted.

3. Until October, 1976, PRMSA had two operating agents, PRMMI and another, identified as "MTM."

4. PFEL is a Delaware corporation with its principal place of business in San Francisco and an office in New York City. It is also alleged to be a "competitor" of Star Lines.

5. The parties dispute whether the charter to PFEL was made before or after February 17.

charge a conspiracy among PRMSA, PFEL and unnamed others to have PRMSA and PFEL enter into a contract which would eliminate Star Lines as a competitor of PFEL "in the service of 'roll-on roll-off' cargo vessels operating" on the East Coast-Persian Gulf run, and which was an attempt to establish a monopoly for PFEL in the same market, in violation of §§ 1 and 2 of the Sherman Act. The last two counts, grounded in common law, are directed only at PFEL. They charge tortious interference with Star Lines' contractual relations with PRMSA, and business defamation.[6]

*The motion to transfer for lack of venue*

Pursuant to 28 U.S.C. § 1406(a),[7] PRMSA moves for transfer on the grounds that venue over it does not lie in this district. Plaintiff asserts that venue may be properly laid here under 15 U.S.C. § 22, which provides:

> "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business. . . ."

Section 22 (§ 12 of the Clayton Act) was enacted to enlarge the venue provisions of 15 U.S.C. § 15 (§ 4 of the Clayton Act)[8] so that parties injured by violations of the antitrust laws could more easily seek redress in the courts. *United States v. Scophony Corp.*, 333 U.S. 795, 808, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). Specifically, the new venue statute made it possible to sue a corporation wherever it "transacted business" as well as in those districts where the corporation could be "found." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 372, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

■ In light of its remedial purpose, § 22 has been construed liberally. First, the ac-

tivity complained of need not be related to the business transactions in this district upon which venue is predicated. *National Auto Brokers Corp. v. General Motors Corp.*, 332 F.Supp. 280, 282 (S.D.N.Y.1971); *United States v. Burlington Industries, Inc.*, 247 F.Supp. 185, 187 (S.D.N.Y.1965).

Second, determining whether a corporation is transacting business within the meaning of § 22 requires a particularly pragmatic inquiry whose touchstone is the realities of commercial affairs. The question is whether the corporation "in fact, in the ordinary and usual sense . . . 'transacts business' [in the district] of any substantial volume." *Eastman Kodak Co. v. Southern Photo Materials Co., supra*, 273 U.S. at 373, 47 S.Ct. at 403. So construed, § 22 is concerned with "practical, business conceptions" rather than the "hairsplitting legal technicalities" which had previously governed venue in antitrust cases. *United States v. Scophony Corp., supra*, 333 U.S. at 808, 68 S.Ct. 855. Whether business is transacted in a district is to be determined by "an appraisal of the unique circumstances of a particular situation." *Id.* at 819, 68 S.Ct. at 867 (Frankfurter, J., concurring).

■ Applying § 22 so as to effectuate its remedial purpose, PRMSA is transacting business in this district, within the meaning of the statute, by virtue of the not insubstantial and continuous business activities in New York of PRMMI, its operating agent.

Star Lines claims, and it is not disputed by PRMSA, that PRMMI maintains an office in this district, and that customers may make bookings on PRMSA's ships through that office. It is also claimed, and also not disputed, that the New York office played an important role in the operation of the PRMSA–Star Lines agency contract for the S. S. Puerto Rico: Star Lines frequently

---

**6.** This last count was first asserted by plaintiff in its amended complaint, filed in August.

**7.** "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any

district or division in which it could have been brought."

**8.** Section 7 of the Sherman Act was repealed in 1955, but its substance has been preserved by § 4 of the Clayton Act, 15 U.S.C. § 15.

delivered reports and other communications to PRMMI's New York office for delivery to PRMMI's headquarters in Elizabeth and Baltimore, and on some occasions the New York office collected payments from S. S. Puerto Rico customers. In other contexts, activities such as these have been viewed as indicating corporate presence, making the corporation subject to the personal jurisdiction of the local court on any cause of action. *See Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). These activities are even more indicative of amenability to suit in this context, where the determination must be made with the remedial purpose of § 22 in mind. *See J. & B. & S. Restaurant Corp., Inc. v. Henry's Drive-In, Inc.*, 353 F.Supp. 389, 391 (W.D.N.Y.1973) ("factors manifesting the transaction of business" include "a place to do business . . . people to carry on business" and "business operations").

It is unnecessary to decide, however, whether the activities discussed above constitute, by themselves, the transaction of business in New York. For it appears that a substantial proportion of PRMSA's customers are New York shippers. It is alleged, and again not contested, that

PRMMI, using its own containers and trailers, frequently picks up cargo from shippers in New York City to be loaded on PRMSA ships docked in Port Elizabeth, across the river from New York.[9] Since PRMMI's business (as agent for PRMSA) is the transportation of goods, it is clearly engaged in the transaction of its business when it makes the initial pick up of the goods from the shipper in New York. An analogous situation confronted the court in *Crawford Transport Co. v. Chrysler Corp.*, 191 F.Supp. 223 (E.D.Ky.1961). The court there held that a common carrier that transported motor vehicles into a district transacted business there within the meaning of § 22. As the court pointed out,

> "[T]he whole reason for the existence of this defendant and the purpose for its having originally been incorporated is to transport motor vehicles and deliver them to dealers in interstate commerce. When it carries out the acts for which it is licensed, it must surely be transacting business." *Id.* at 226.

So too, when a shipper comes into New York to pick up the goods to be transported on its vessels, it is transacting its business here.[10]

---

**9.** More precisely, Star Lines alleges that cargo is regularly picked up from New York City shippers, and that the containers and trailers which pick up the goods are owned by PRMSA itself, and are registered in New York. PRMSA has twice specifically addressed this contention. In its reply brief, PRMSA contends that all of the containers and trailers that it owns are licensed in New Jersey, not in New York. At oral argument, PRMSA asserted that it owned no trucks at all, but that all the trucks were owned by PRMMI. It will be assumed for purposes of this motion that all the vehicles involved are owned by PRMMI and licensed in New Jersey. However, we view PRMSA's statements regarding the ownership and licensing of the vehicles discussed by Star Lines, and the failure to deny Star Lines' assertion that the vehicles regularly pick up goods in New York City despite the fact that PRMSA twice "corrected" other details of Star Lines' assertion, as an admission that the gist of the claim is true.

**10.** While neither party had indicated what volume of PRMMI/PRMSA's business is attributable to New York shippers, there is sufficient reason to believe that the New York business is

substantial enough to satisfy the requirements of § 22. The substantiality of the business done is to be judged from the viewpoint of the average businessman, and not the corporate giant. *Fashion Two Twenty, Inc. v. Steinberg*, 339 F.Supp. 836, 841 (E.D.N.Y.1971). *See also United States v. Burlington Industries, Inc.*, 247 F.Supp. 185, 187 (S.D.N.Y.1965); *J. & B. & S. Restaurant Corp., Inc. v. Henry's Drive-In, Inc.*, 353 F.Supp. 389, 392 (W.D.N.Y.1973). From this viewpoint, as little as $30,000 of sales is substantial (*Fashion Two Twenty, Inc. v. Steinberg, supra*); so too, sales that constitute less than 2% of defendant's business is not insubstantial (*J. & B. & S. Restaurant Corp., Inc. v. Henry's Drive-In, Inc., supra*). In short, the question is whether the amount of business in issue is so little as to be insignificant.

I have no doubt that PRMMI's New York business is substantial for purposes of § 22. PRMSA's business is shipping cargo between East Coast ports and the Caribbean. Port Elizabeth, which services PRMSA's New York customers (*see* note 9, *supra*), is one of the major ports of call for PRMSA's ships. PRMMI's vehicles regularly make pick-ups in New York City. *See* note 9, *supra*. It is highly unlikely

Since PRMMI transacts business in New York, PRMSA is subject to suit here, for under these circumstances, the activities of PRMSA's agent are attributable to it for the purpose of determining whether venue is proper. PRMSA has assigned complete responsibility for the operation of its business to a managing agent, reserving to itself authority only with respect to what it calls "policy decisions." PRMSA has no other business other than what PRMMI does for it (except for the agency agreement with Star Lines for the S. S. Puerto Rico and similar arrangements that may have existed from time to time). It is clear that when PRMMI acted with regard to ships owned by PRMSA, it was doing no less than carrying on the business of PRMSA. Under these circumstances, the "legal technicality" that PRMSA is a separate entity does not obscure the "practical, business" realities of this arrangement—it is PRMSA's business which is being transacted here, and for § 22 purposes, it is PRMSA that is transacting it. *See National Auto Brokers Corp. v. General Motors Corp., supra,* 332 F.Supp. at 284 ("the activities of a correspondent bank . . . are to be considered activities of the principal for the purpose of determining whether the principle 'transacts business' within a District" when it "was foreseeable that correspondent activities would constitute a part of the banking business and be of benefit to the [principal] banks"). *Cf. United States v. Scophony Corp., supra* (British corporation found to transact business in New York by virtue of its involvement with a partly owned American corporation formed to exploit patents held by the British corporation).[11]

Under what circumstances venue for a corporation can be predicated upon the activities of another entity is a question that has more frequently arisen in the context of parent and subsidiary corporations. While not controlling (for it does not appear that PRMMI is a subsidiary of PRMSA), these cases are instructive. Usually the determinative question is considered to be whether "the parent corporation controls the day-to-day business operations of its subsidiary." *Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 130 (D.N.H. 1975); *accord, In re Chicken Antitrust Litigation,* 407 F.Supp. 1285, 1293 (N.D.Ga. 1975). *But cf. Waldron v. British Petroleum Co.,* 149 F.Supp. 830 (S.D.N.Y.1957) (court stresses the function of the subsidiary in the overall corporate structure of the parents' enterprise); *K. J. Schwartzbaum, Inc. v. Evans, Inc.,* 44 F.R.D. 589, 591 (S.D. N.Y.1968) (test is both "what part the subsidiary plays in the business activity of the parent company and what degree of control the parent corporation exercises over the day-to-day operations of the subsidiary"). Of course, PRMSA does not control the day-to-day operations of PRMMI; rather, the exact opposite is true. Nonetheless, the rationale of these decisions supports the conclusion that venue with respect to PRMSA is proper in New York.

The question posed by parent-subsidiary situations is when is it proper to disregard the form of corporate entities. The underlying issue there is whether two nominally distinct entities are really one for venue purposes, and the problem is to distinguish between cases where there are two functioning businesses and cases where one entity carries on its business through a shell

---

that the trade between New York and the Caribbean constitutes an insubstantial portion of PRMSA's business.

In view of the virtual certainty that PRMSA's New York business is substantial, and in view of the fact that venue is based not only on the shipments from New York but also on the existence and activities of PRMMI's New York office (discussed *supra*), it would serve no useful purpose to require discovery before deciding this motion so that Star Lines could establish the exact amount of the New York trade.

11. PRMSA correctly points out that, unlike § 15, § 22 does not expressly indicate that venue may be based on the in-district activities of a corporation's agent. However, there is no reason to read this difference in language as requiring a court to ignore the activities of agents when venue is at issue under § 22. Indeed, such an interpretation would vitiate the very purpose of § 22. I decline to read § 22 as being narrower in this regard than the statute it was designed to enlarge upon.

corporation. To solve that problem, courts have found it helpful, if not determinative, to ascertain whether the parent controls all the significant operations of the subsidiary in question. *See In re Chicken Antitrust Litigation, supra,* 407 F.Supp. at 1294 (no venue with respect to parent where "the subsidiary *maintains its separate entity* and carries on its activities without having its daily business affairs controlled by the parent *so that it does not appear to be merely the parent's agent.* . . .") (emphasis added).

In this case, it is irrelevant that PRMSA does not control the daily operations of PRMMI, for PRMMI has exclusive control over the daily business operations of PRMSA itself. It is manifest that PRMSA is carrying on its business—virtually all of its business, in terms of both quantity and function—through PRMMI. The functions fulfilled by PRMMI are obviously the primary and indispensable components of PRMSA's trade. Under these circumstances, PRMMI is not merely an agent of PRMSA, it *is* PRMSA, at least for venue purposes. Venue is proper in this district.[12]

*The motion to transfer for convenience and the interest of justice*

■ In the alternative, PRMSA moves for transfer under 28 U.S.C. § 1404(a).[13] The burden of persuasion regarding the appropriateness of a discretionary transfer lies with the movant. Transfer will not be granted "[a]bsent a clear cut and convincing showing by defendant that the balance of convenience weighs strongly in favor of the transferee court. . . ." *General State Authority (of Pennsylvania) v. Aetna Casualty and Surety Co.,* 314 F.Supp. 422, 423 (S.D.N.Y.1970). *See also City of New York v. General Motors Corp.,* 357 F.Supp. 327 (S.D.N.Y.1973); *Levin v. Mississippi River Corp.,* 289 F.Supp. 353 (S.D.N.Y. 1968); *Saperstone v. Kapelow,* 279 F.Supp. 781 (S.D.N.Y.1968). That burden is especially heavy in antitrust suits, where plaintiff's choice of forum is entitled to particular respect. *See Ford Motor Co. v. Ryan,* 182 F.2d 329 (2d Cir.), *cert. denied,* 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950); *United States v. General Motors,* 183 F.Supp. 858 (S.D.N.Y.1960). Although the question in this case is not free from all doubt, I am not satisfied that PRMSA has met this burden.

■ PRMSA's primary argument in support of its motion is that trial in New York would be manifestly inconvenient to it and its witnesses, most of whom are high level employees of PRMSA.[14] There is no doubt that trial in Puerto Rico would necessitate less of an interruption in the business of PRMSA and the lives of its witnesses. However, the inconvenience of testifying in New York would not appear to be insufferable in light of the fact that a witness need only be present while testifying, not for the entire duration of the trial. Further, PRMSA's claim that litigation in New York would be a great inconvenience is contradicted somewhat by its agreement to arbitrate any disputes arising under the PRMSA-Star Lines agency agreement in New York.

12. Plaintiff's counsel has recently brought to the court's attention an affidavit of a former Executive Director of PRMSA that was submitted in another case in this district. Sworn to on March 19, 1976, the affidavit states in part that "PRMSA's ships are frequently present in the Port of New York . . . PRMSA continually does business in New York and, since such business is necessary to serve the Commonwealth, will continue to do such business indefinitely." In light of the determination that PRMSA is transacting business here through the activities of PRMMI, it is unnecessary to explore the issues raised by this affidavit, or to determine what weight to give it in the face of the contrary position taken by PRMSA in this litigation.

13. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

14. In addition to persons who are presently employees, PRMSA asserts that the testimony of two of its former executives will be crucial to its case. As non-parties residing in Puerto Rico, these witnesses are beyond the subpoena power of this court. However, there is no reason to believe that PRMSA cannot procure the voluntary attendance of its former Executive Director and its former General Counsel.

**1208**

In opposing the § 1404(a) transfer motion, Star Lines, too, addresses the convenience of the witnesses it intends to call at trial, witnesses who are located in the New York area. Star Lines claims it will require testimony from several of its New York personnel, as well as from "various shippers" in the New York area. However, plaintiff does not indicate how the testimony of these persons will shed light on any significant issue in this action. *See Ryer v. Harrisburg Kohl Brothers, Inc.*, 307 F.Supp. 276, 280 (S.D.N.Y.1969). Were the case for transfer stronger, Star Lines' assertions regarding its intent to call witnesses located in New York might be insufficient to keep the action here. Nevertheless, it does appear that testimony from New York and other East Coast shippers will be necessary to establish Star Lines' claim that PFEL tortiously injured Star Lines' reputation among shippers that were either present or potential customers of plaintiff. Transfer of this action to Puerto Rico would place these possible witnesses beyond the subpoena power of the court, and voluntary attendance would be at least as inconvenient for the shippers as attendance in New York would be for PRMSA's witnesses.

▉ Another circumstance which, it is urged, indicates the propriety of transfer is the pendency in Puerto Rico of a suit by PRMSA and the Commonwealth of Puerto Rico against Star Lines and others based upon the alleged failure to return to PRMSA the trailers carried by the S. S. Puerto Rico.[15] Normally, the pendency of related suits in other districts is a consideration that is germane to the transfer question. However, in the setting of this case, that factor is less compelling. The suit in Puerto Rico was commenced over three months after the instant suit was begun. There is no indication that litigation in Puerto Rico has proceeded to a more advanced stage than in this suit. *Cf. Polaroid Corp. v. Casselman*, 213 F.Supp. 379, 381 (S.D.N.Y.1962) (question is primarily "sub-

stantial commitment to the cause," not "priority in filing time"). And from the complaint in the Puerto Rico action, it does not appear that Puerto Rico is a considerably more convenient forum than New York for the litigation of that suit. Under any of these tests, the pendency of the suit in Puerto Rico does not measurably strengthen the argument for transfer there. It may be that both suits ought to be consolidated in one forum, but it is not clear that that forum ought to be Puerto Rico.

Lastly, PRMSA argues that this suit has a strong nexus with Puerto Rico because "PRMSA's affairs touch the lives of practically everyone on the Island . . . ." (memorandum in support of motion to change venue, p. 17), citing to *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). This concern with the affairs of PRMSA is said to be because Puerto Rico is dependent upon maritime shipping, and because any judgments against it are ultimately the liability of PRMSA's owner, the Commonwealth.

Reliance upon *Gulf Oil Corp. v. Gilbert* in the context of this suit is misplaced. In *Gulf Oil*, the suit concerned a fire that consumed a warehouse, destroying the goods of hundreds of residents of a small community. In that case, the suit no doubt "touch[ed] the affairs of many persons" living in the vicinity of the warehouse. *Ibid.* But a suit against a commercial corporation cannot be said to touch the affairs of local residents in the same immediate way simply because the corporation is owned by the Commonwealth. The interest of individual Puerto Ricans in the outcome of this litigation is, at best, remote.

In addition to the interests of PRMSA and Star Lines, the convenience of co-defendant PFEL and its witnesses must also be considered. PFEL opposes the motion to transfer on the grounds that venue as to it would not lie in Puerto Rico, foreclosing the possibility of transfer under § 1404(a). *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct.

---

15. The relationship between this suit and the agreement to arbitrate all disputes arising out of the agency contract is not clear.

1084, 4 L.Ed.2d 1254 (1960). PFEL does not address the relative conveniences to it and its witnesses of suit in New York or Puerto Rico. While it is unnecessary to reach the merits of PFEL's argument, the simple fact of PFEL's opposition to transfer is revealing. I take PFEL's stance on this motion to be indicative of a judgment that New York would be the more convenient forum from its point of view. While the unarticulated desires of a litigant are by no means controlling, PFEL's wishes, as best they can be perceived, are entitled to some consideration.

Considering this, as well as all the other, arguments advanced by the parties, PRMSA has not made a showing sufficient to justify transfer. Of course, there are no mathematical or mechanical devices by which a court can precisely calculate an inevitable result from the various factors presented to it. "At best, the judge must guess . . . ." *Ford Motor Co. v. Ryan, supra,* 182 F.2d at 331–32. On this record, my best judgment is that plaintiff's choice of forum should not be disturbed.

Accordingly, the motion to transfer under § 1406(a) or § 1404(a) is denied. PFEL's motion for an extension of time in which to answer is granted. *See* note 2, *supra.*

IT IS SO ORDERED.